MAURICE PINCOFFS COMPANY,
Appellant,

v.

SOUTHERN STEVEDORING COMPANY,
Inc., Appellee.

No. 498.

Court of Civil Appeals of Texas,
Houston (14th Dist.).

Oct. 27, 1971.

Rehearing Denied Nov. 17, 1971.

Thomas E. Giles, Ross, Griggs & Harrison, Houston, for appellant.

Robert M. Julian, Binson, Elkins, Searls & Smith, Houston, for appellee.

TUNKS, Chief Justice.

This is a suit by Maurice Pincoffs Company, hereinafter called Pincoffs, against Southern Stevedoring Company, Inc., hereinafter called Southern, for damage to goods owned by Pincoffs and unloaded from ships by Southern. In the trial court the jury returned a verdict for the plaintiff, Pincoffs, but, on motion for judgment notwithstanding the verdict, judgment was rendered for the defendant, Southern. Pincoffs has appealed.

Pincoffs is an importer of steel and other metals. In 1966 and 1967 Pincoffs purchased such materials in Europe and shipped them, by three chartered ships from Antwerp, Belgium to Houston, Texas. Southern is, as its name indicates, a stevedore. In each of the three shipments a contract was made between Pincoffs and Southern by which Southern was employed

to unload the cargo at the Port of Houston dock. Southern unloaded the cargo from the ships onto trucks or railroad cars for transportation to inland points. Part of the material was taken to Pincoffs' premises and other parts were delivered to the premises of customers who had purchased from Pincoffs. There is testimony to the effect that inspection of the material at the premises of Pincoffs and at those of the purchasers showed some of it to be damaged. It is to recover for the damage so discovered that this suit is maintained. Pincoffs has recognized and adjusted the claims for such damage made to it by its customers.

The evidence by which Pincoffs undertook to prove the fact that Southern's handling of the cargo caused the damage sued for, and the amount thereof, was the testimony of Fred William Smart, an expert, a marine surveyor. Smart did not testify that he saw any particular item of damage that occurred while Southern was handling the cargo. He did not testify that Southern used any improper or defective equipment in the unloading or any procedures other than those which were proper and customary. The only evidence, if any, that Southern failed to perform their work in a workmanlike manner was in the fact that some damage to the cargo was later discovered. (One possible exception will be discussed later.) Smart testified as to the damaged condition of the material as inspected by him at the premises of Pincoffs and Pincoffs' customers and then attempted to eliminate all other possible causes of such damage so as to show that it was caused by Southern's handling.

The material allegedly damaged by Southern's handling consisted of steel pipe, structural steel and rolled sheet aluminum. It was bought by Pincoffs from mills in Europe. Obviously, it was handled several times before it reached the warehouses of Pincoffs and its customers. At the European mills it was loaded onto some form of inland carrier and shipped to the dock at Antwerp. There it was loaded onto the vessels. It was transported across the Atlantic. It was unloaded, by Southern, from the vessels to inland carriers. It was transported by inland carriers to the premises of Pincoffs and Pincoffs' customers. It was unloaded from those carriers into the warehouses.

For the purposes of this opinion we will assume, without so holding, that Smart's testimony would have sustained the jury's conclusion that the cargo was not damaged either during the voyage or after it left the Houston dock. Nevertheless we hold that there was no evidence that eliminated the possibility that some or all of the damage occurred during the handling of the material before or at the time it was loaded onto the vessels at Antwerp.

Smart admitted that he had no first hand knowledge of the handling of the material in Europe or of its condition immediately after it was loaded onto the ships. In an attempt to prove that the damage for which it sued was not caused before or while the cargo was loaded at Antwerp, Pincoffs introduced bills of lading that were issued when the cargo was loaded. Those bills of lading had attached to them "exceptions" lists. Those lists, in this case, included recitations as to items of damage to the cargo as loaded onto the vessels. As an example, and using round numbers, one of such exceptions listed 100 joints of pipe as being bent. Smart testified that when he examined, at the Pincoff's warehouse, the cargo to which that exceptions list pertained he found 1100 joints of bent pipe. From this, considering the possibility of the pipe having been bent during the voyage or after it left the Houston dock as eliminated, he concluded that 1000 joints of pipe had been bent by Southern's handling of it.

A bill of lading serves two primary purposes. It is a receipt for the goods shipped issued by the carrier to the shipper. It also is, subject to relevant statutory regulations, a contract of carriage between the carrier and the shipper. Gil-

more and Black, The Law of Admiralty, 87 (1957). The usual suit for damage to goods shipped is one wherein the shipper sues the carrier. In such a suit the parties to the law suit are also parties to the bill of lading and it is admissible in evidence. 9 Tex.Jur.2d Bills of Lading Sec. 55 (1969). But this is not the usual suit for damages to goods shipped wherein the shipper is plaintiff and the carrier is defendant. Here the shipper, Pincoffs, sues Southern, the stevedore. Southern was not a party to the bills of lading issued as to these cargoes. As to it, the bills of lading were hearsay.

The bills of lading and the exceptions lists attached to them were not proven to be exceptions to the hearsay rule under the business records statute, Vernon's Ann. Tex.Rev.Civ.Stat. art. 3737e. The witness who testified concernnng them, Smart, had no personal knowledge as to who prepared them or under what circumstances or by what procedures they were prepared. They were, therefore, hearsay and, even though received in the record, constituted no evidence as to the condition of the goods as loaded at Antwerp. Aetna Insurance Company v. Klein, 160 Tex. 61, 325 S.W.2d 376 (1959). Smart admitted that he could not identify that portion of the damage to the pipe and the structural steel sustained while handled by Southern without relying on those records.

■ As to that part of the cargo consisting of rolled sheet aluminum there was testimony by Smart that Southern used a method of unloading which he considered improper. He testified that Southern's employees had unloaded them by running a wire cable through the eye of the coils and lifting them off the ship; that this resulted in bending and cutting the aluminum; and that other devices were properly used for lifting aluminum coils. However, when asked to describe the damage he said that he could not "(s)ee beneath all the wrappings and such, and due to the position of the coils at the time on the truck * * *." When asked if he later had ex-amined the coils he said, "I engaged a firm in the city of their destination, which was between Fort Worth and Dallas, to do that inspection work for us." It is apparent that Smart had no personal knowledge on the basis of which he could testify that the coils were damaged, or, if they were damaged, the amount thereof.

There was no evidence to support any of the jury's findings. A necessary basis for a finding that Southern's handling damaged the pipe and structural steel, and the amount of such damage, was the acceptance of the bills of lading with their attached exceptions list as proof that such goods were not damaged as loaded onto the vessels. Those documents were hearsay. Smart's testimony as to the fact and amount of damage to the aluminum was based upon reports from some unidentified person at the point of their destination. That testimony, too, was hearsay. The trial court properly granted Southern's motion for judgment notwithstanding the verdict.

Affirmed.